## AFFIDAVIT IN SUPPORT OF
## <u>AN APPLICATION FOR A SEARCH WARRANT</u>

I, Amy L. Ramsey, being first duly sworn, hereby depose and state as follows:

## <u>INTRODUCTION AND AGENT BACKGROUND</u>

1.      I make this affidavit in support of an application for a search warrant under
Federal Rule of Criminal Procedure 41, 18 U.S.C. §§ 2703(a), and 2703(c)(1)(A), for
information about 1) the prospective location of the cellular telephone assigned call number
*(816) 716-1615* (hereinafter referred to as the "TARGET PHONE NUMBER"), as detailed in
Attachment B-1; and 2) historic location data for the TARGET PHONE NUMBER, as detailed
in Attachment B-2[1], whose service provider is VERIZON ("PROVIDER"), a wireless telephone
service provider headquartered at 180 Washington Valley Road, Bedminster, New Jersey.

2.      As a provider of wireless communications service, the PROVIDER is a provider of
an electronic communications service, as defined in 18 U.S.C. § 2510(15).

3.      Because this warrant seeks the prospective collection of information, including
cell-site location information, which may fall within the statutory definitions of information
collected by a "pen register" and/or "trap and trace device," *see* 18 U.S.C. § 3127(3) & (4), the
requested warrant is designed to also comply with the Pen Register Act.  See 18 U.S.C. §§ 3121-
3127.  The requested warrant therefore includes all the information required to be included in an
order pursuant to that statute.  *See* 18 U.S.C. § 3123(b)(1).  A certification by Assistant United
States Attorney Patrick Edwards, an attorney for the government, that the information likely to be

---

[1] Upon receipt of the information described in Section I of Attachment B-2, government-authorized persons will
review the information to locate items described in Section II of Attachment B-2.

obtained is relevant to an ongoing criminal investigation being conducted by Federal Bureau of Investigation is included on the signature page of this affidavit.

4.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Section 2516 of Title 18, United States Code.  Your affiant is a Special Agent with the Federal Bureau of Investigation (FBI) and I have been so employed since 2009. I have received training in the enforcement of laws of the United States, including training in the preparation, presentation, service, and execution of criminal complaints and arrest and search warrants. I completed a twenty-one-week training program at the FBI Academy, which included instruction in the investigation of various criminal offenses governed by federal law, and I have received advanced training in matters relating to criminal investigations. I am currently assigned to the FBI Kansas City Division Transnational Organized Crime squad, where I investigate drug trafficking and firearms violations. Within the Kansas City Division, I have also been assigned to the Violent Crimes Against Children and Human Trafficking Task Force. I am collaterally assigned to a specialized unit through FBI Headquarters known as the Child Abduction Rapid Deployment Team (CARD).

5.      The facts in this affidavit come from my participation in this investigation, personal observations, my training and experience, and information obtained from other agents and witnesses.  Because this affidavit is being submitted for the limited purpose of enabling this Court to make a judicial determination of probable cause to issue a search warrant, I have not included each and every fact known to me concerning this investigation.  I have set forth only the facts that I believe are necessary to establish the legal basis for the issuance of a search warrant.

6.      Based on the facts set forth in this affidavit, there is probable cause to believe that violations of 21 U.S.C. §§ 841(a), Drug Trafficking, and 18 U.S.C. §§ 1956, Money Laundering, have been committed, are being committed, and will be committed by **Salvador Valdivia**.  There is also probable cause to believe that the historical location information, as described in Attachment B-2, and that the prospective location information, as described in Attachment B-1, will constitute evidence of these criminal violations, and will lead to evidence of the commission of these offenses.  Moreover, the prospective location information described in Attachment B-1 will provide evidence of where the phone is currently located, and there is probable cause to believe the phone is an instrumentality of the offenses described herein.

7.      Based on the facts set forth in this affidavit, there is probable cause to believe that **Salvador Valdivia** has violated 21 U.S.C. §§ 841(a), Drug Trafficking, and 18 U.S.C. §§ 1956, Money Laundering (hereinafter, "the TARGET OFFENSES").  There is also probable cause to believe that locating the TARGET PHONE NUMBER will assist law enforcement in locating evidence of the TARGET OFFENSES (including **Valdivia's** cell phone), as well as evidence of where **Valdivia** is currently located, as his current whereabout are unknown.

8.      The Court has jurisdiction to issue the proposed warrant because it is a "court of competent jurisdiction" as defined in 18 U.S.C. § 2711.  Specifically, the Court is a district court of the United States that has jurisdiction over the offense being investigated; *see* 18 U.S.C. § 2711(3)(A)(i).

## PROBABLE CAUSE

9.      This investigation into **Valdivia** and his DTO began in 2019. In July 2019, a confidential human source (CHS) identified several Tango Blast members living and operating in the Kansas City metropolitan area, led by Tango Blast member **Valdivia**, who operated auto repair and

sales locations in Kansas City, where he was moving large amounts of narcotics, specifically cocaine. It has been reported that **Valdivia** was receiving upwards of 25 kilograms of cocaine on a routine basis, which he then distributed through Tango Blast members and others in the Kansas City metropolitan area. A CHS reported the narcotics were being shipped into the area inside of vehicles.

10.     In 2019, **Valdivia's** cellular telephone number was identified as the TARGET PHONE NUMBER. The TARGET PHONE NUMBER has been utilized throughout the investigation by **Valdivia. Valdivia** has used the TARGET PHONE NUMBER to communicate with associates of the DTO and confidential human sources. **Valdivia** has also been recorded via jail calls utilizing the TARGET PHONE NUMBER to communicate with incarcerated co-defendants.

11.     In January 2021, in a parallel Organized Crime Drug Enforcement Task Force (OCDETF) case Operation Troll Factory, a Title III investigation was authorized by the Western District of Missouri. The TARGET PHONE NUMBER was utilized by **Valdivia** throughout the duration of the Title III investigation.

12.     In May 2021, a Title III investigation was authorized on the TARGET PHONE NUMBER. Intercepted calls showed **Valdivia** utilized the TARGET PHONE NUMBER to communicate with co-defendants about pertinent drug activity throughout the Title III investigation.

13.     On June 21, 2022, **Valdivia** was Federally indicted in the Western District of Missouri along with 17 co-defendants in a drug trafficking conspiracy investigation.

14.     On June 23, 2022, an arrest operation was conducted at **Valdivia's** residence, 4315 Wyoming Street, Kansas City, MO. At the time of the operation, **Valdivia** was not located at the residence. Contact was made with **Valdivia's** mother, Guadalupe Rennau, who informed

investigators that **Valdivia** was out of town, possibly driving back to Kansas City from Houston, Texas. While investigators were with Rennau on June 23, 2022, **Valdivia** repeatedly called his mother from the TARGET PHONE NUMBER. Rennau confirmed that the TARGET PHONE NUMBER was currently being utilized by **Valdivia**.

15. Also on June 23, 2022, investigators interviewed Monica Sanchez, a female associated with **Valdivia**, who advised that he was currently utilizing the TARGET PHONE NUMBER as his primary means of communication.

## BACKGROUND ON CELL-SITE DATA AND LOCATION INFORMATION

16. In my training and experience, I have learned that the PROVIDER is a company that provides cellular telephone access to the general public. I also know that providers of cellular telephone service have technical capabilities that allow them to collect and generate information about the locations of the cellular telephones to which they provide service, including: (1) E-911 Phase II data, also known as GPS data or latitude-longitude data, and (2) cell-site data, also known as "tower/face information" or "cell tower/sector records." E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by triangulating on the device's signal using data from several of the provider's cell towers. Cell-site data identifies the "cell towers" (i.e., antenna towers covering specific geographic areas) that received a radio signal from the cellular telephone and, in some cases, the "sector" (i.e., faces of the towers) to which the telephone connected. These towers are often a half-mile or more apart, even in urban areas, and can be 10 or more miles apart in rural areas. Furthermore, the tower closest to a wireless device does not necessarily serve every call made to or from that device. Accordingly, cell-site data is typically less precise that E-911 Phase II data.

17.     Based on my training and experience, I know that the PROVIDER can collect cell-site data about the TARGET PHONE NUMBER.  Based on my training and experience, I know that for each communication a cellular device makes, its wireless service provider can typically determine: (1) the date and time of the communication; (2) the telephone numbers involved, if any; (3) the cell tower to which the customer connected at the beginning of the communication; (4) the cell tower to which the customer connected at the end of the communication; and (5) the duration of the communication.  This information can be extremely useful when attempting to locate a suspect or identify his or her past historical location. I also know that wireless providers such as the PROVIDER typically collect and retain cell-site data pertaining to cellular devices to which they provide service in their normal course of business in order to use this information for various business-related purposes. By analyzing the incoming and outgoing phone numbers along with the duration, date, and time of who the subject (TARGET PHONE NUMBER) is communicating with through the cellular service provider's records can assist law enforcement in identifying the other party to the call.  By running those telephone numbers through normal investigative steps and searches through open-source public databases, this can lead to the identification of specific locations such as a hotel, residence, or other type of physical address.  When used in conjunction with cell-site and other precision location information can lead to identifying and confirming specific addresses or areas of interest where the subject is or has been. This information is also necessary and part of the service provider's call detail records (ordinary business records) associated with historical cell-site information and is necessary to gain a more complete understanding and more accurate view of a subject's historical and perspective location.

18.     Based on my training and experience, I know that Verizon also can collect timing advance data, which Verizon also refers to as Real Time Tool.  Timing advance data estimates the

approximate distance of the cellular device from a cellular tower based upon the time it takes for signals to travel between the device and the tower. This information can be used to estimate an approximate location range that is more precise than typical cell-site data.

19.     Based on my training and experience, I know that each cellular device has one or more unique identifiers embedded inside it. Depending on the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), a Mobile Subscriber Integrated Services Digital Network Number ("MSISDN"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Equipment Identity ("IMEI"). The unique identifiers – as transmitted from a cellular device to a cellular antenna or tower – can be recorded by pen-trap devices and indicate the identity of the cellular device making the communication without revealing the communication's content. Also, once the subject has been taken into custody, this identifying account information (to include email addresses and subscriber information may also be necessary for evidentiary purposes to identify the cellular records with the subject's phone itself on a particular date and time. Furthermore, other identifying information such as subscriber information, email addresses associated with the user of the account, all assist law enforcement identify and confirming the end user (subject) to the account maintained by the service provider. This information may also help identify if the subject discontinues service, changes devices (such as IMEI, ESN, MEID), or if someone else begins using this telephone number after the subject terminates the account or provides the phone to another user.

20.     Based on my training and experience, I know that wireless providers such as the PROVIDER typically collect and retain information about their subscribers in their normal course

of business. This information can include basic personal information about the subscriber, such as name and address, and the method(s) of payment (such as credit card account number) provided by the subscriber to pay for wireless communication service. I also know that wireless providers such as the PROVIDER typically collect and retain information about their subscribers' use of the wireless service, such as records about calls or other communications sent or received by a particular device and other transactional records, in their normal course of business. In my training and experience, this information may constitute evidence of the crimes under investigation because the information can be used to identify the TARGET PHONE NUMBER's user or users.

## **AUTHORIZATION REQUEST**

21.     Based on the foregoing, I request that the Court issue the proposed search warrant, pursuant to Federal Rule of Criminal Procedure 41 and 18 U.S.C. § 2703(c).

22.     The proposed warrant will also function as a pen register order under 18 U.S.C. § 3123 authorizing the installation and use of a pen register and/or trap and trace device to record, decode, and/or capture certain information in Attachment A-1 for each communication to or from the TARGET PHONE NUMBER, without geographic limit, for a period of thirty (30) days pursuant to 18 U.S.C. § 3123(c)(1).

23.     I further request that the Court direct the PROVIDER to disclose to the government any information described in Section I of Attachment B that is within its possession, custody, or control. I also request that the Court direct PROVIDER to furnish the government all information, facilities, and technical assistance necessary to accomplish the collection of the information unobtrusively and with a minimum of interference with the PROVIDER's services, including by initiating a signal to determine the location of the TARGET PHONE NUMBER on the PROVIDER's network or with such other reference points as may be reasonably available, and at

such intervals and times directed by the government. The government shall reasonably compensate the PROVIDER for reasonable expenses incurred in furnishing such facilities or assistance.

24. Because the warrant will be served on the PROVIDER, who will then compile the requested records at a time convenient to it, good cause exists under Rule 41 to permit the execution of the requested warrant at any time in the day or night. Further, pursuant to 18 U.S.C. § 2703(g), the presence of a law enforcement officer is not required for the service or execution of this warrant.

## **CONCLUSION**

25. I submit that this affidavit supports probable cause for a warrant to collect the requested information about the location of the TARGET PHONE NUMBER, as described in Attachment A-1, and to seize the evidence described in Attachments B-1 and B-2.

Respectfully submitted,

Amy L. Ramsey
Special Agent
Federal Bureau of Investigations

Subscribed and sworn to before me via telephone or other reliable electronic means on June ___23rd___, 2022    Sworn to by telephone
                                                1:45 PM, Jun 23, 2022

Honorable Lajuana M. Counts
United States Magistrate Judge
Western District of Missouri



**Attorney Certification Under 18 U.S.C. §§ 3121-3127**

To ensure technical compliance with 18 U.S.C. §§ 3121-3127, the warrant applied for herein will also function as a pen register order. I, an attorney for the Government, certify that the information likely to be obtained is relevant to an ongoing criminal investigation being conducted by the Federal Bureau of Investigation. *See* 18 U.S.C. §§ 3122(b), 3123(b).

Patrick Edwards
Assistant United States Attorney
District of Kansas